UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| ALEJANDRO VILLARREAL, § | |
|    Plaintiff § | |
| § | |
| vs. § | CIVIL ACTION NO. C-04-513 |
| § | |
| JO ANNE B. BARNHART, § | |
| COMMISSIONER OF SOCIAL § | |
| SECURITY, § | |
|    Defendant § | |

## MEMORANDUM AND RECOMMENDATION

Alejandro Villarreal filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security ("Commissioner") for the purpose of receiving Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff filed a motion and memorandum of law seeking reversal of the Commissioner's decision on July 25, 2005 to which defendant responded on August 18, 2005 (D.E. 24, 25). Plaintiff filed a reply brief on September 26, 2005 (D.E. 28).

### BACKGROUND

Plaintiff filed his applications on August 12, 1994 and they were denied at all administrative levels (Tr. 42-48, 62-68, 11-31, 6-9). Plaintiff alleges an inability to work since January 15, 1992 because of diabetes mellitus and pancreatitis (Tr. 32-33). His reported symptoms include bone, joint, head and back aches, limited mobility, shortness of breath, dizziness and low vision (Tr. 98, 104, 110). Prior to the onset of his disability, he worked in the oil field as a derrick man (Tr. 78-84).

**MEDICAL EVIDENCE**

In 1988 plaintiff was working as a roughneck on an oil rig when he was hit on the head by a platform wall he and another worker were trying to lift (Tr. 121). He suffered headaches and tinnitus after the accident (Tr. 114-123). In May 1989 X-rays were suggestive of spondylosis at L3 bilaterally but there was no evidence of spondylolisthesis (Tr. 125). Plaintiff also reported that he had injured his right foot years earlier and that it caused him pain occasionally (Tr. 126-127). Plaintiff was hospitalized for a mental health condition for about 12 days in the summer of 1989. He had been having trouble with the community and with his relatives. He thought people were harassing him and giving him trouble. He was discharged with a diagnosis of dysthymia, organic personality disorder due to his head injury and an antisocial personality disorder. He was prescribed Haldol and Pamelor (Tr. 143-146). In September 1989 plaintiff complained of neck pain, buzzing in his left ear and intermittent headaches. He became agitated at times and could not stand loud noises (Tr. 155).

In June 1994 plaintiff was diagnosed with diabetes after being admitted to the hospital with diabetic ketoacidosis and acute pancreatitis (Tr. 195-199). He began to use insulin for blood sugar control. Although he had been a heavy alcohol abuser, he reduced his drinking significantly when he was diagnosed with diabetes (Tr. 245). He was advised to stop drinking beer (Tr. 287). He also had used cocaine, uppers, downers and marijuana in the past, but had quit four years previously. He was having blurred vision, but had not undergone an ophthalmological evaluation (Tr. 245).

In July 1995 plaintiff was complaining about bad neck and knee pain (Tr. 286). He had about 80 percent rotation along the spinal axis and eight degree extension and lateral flexion. He could bend to within 20 inches of the ground. He could walk normally, but could not stand on his

2

heels or toes because of loss of balance (Tr. 246).  An X-ray of his lumbar spine showed hypertrophic changes of the L5-S1 segments.  The L5-S1 disc showed some narrowing and degeneration.  The X-rays were otherwise normal (Tr. 247).  Plaintiff continued to complain of joint pain (Tr. 284-285).  He continued to drink beer and smoke (Tr. 283).

Plaintiff underwent a psychiatric evaluation on June 30, 1995.  He reported that his wife had died three years earlier from cancer.  He slept six to seven hours per day and his appetite was poor.  He had dropped from 310 pounds to 265 pounds over the last six years.  He described his mood as irritable and depressed with no history of mania.  He did not have a death wish at that time and had never made a suicide attempt.  He said he often felt like crying.  He reported a past history of alcohol abuse and said he drank approximately one six-pack of beer per week (Tr. 252). On an average day he woke up at 6:30 a.m..  He bathed and changed his clothes daily, prepared his own meals and visited with one or two family members or friends.  He did light housework, but no yard work.  He did not read the newspaper but did watch television (Tr. 253).

His memory was intact. He also was noted to have a dysphoric mood, appropriate affect, fair insight, good reality testing and good impulse control.  His thought processes showed no delusions, hallucinations or loosening of associations and no suicidal or homicidal ideations.  The psychiatrist's impression was that plaintiff probably suffered from dysthymia, mild to moderate, and episodic alcohol abuse.  He had a GAF of 49[1].  The doctor further opined that plaintiff would

---

[1]The Global Assessment of Functioning ("GAF") scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health-illness.  A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  Diagnostic and Statistical Manual of Mental Disorders, 4th Ed.

have difficulty in social settings and with complex tasks for prolonged periods of time and would benefit from psychiatric treatment (Tr. 253-254).

In February 1996 plaintiff continued to complain about pain in his back, neck and right ankle (Tr. 281). In June 1996 plaintiff complained of pain in his back and numbness in his legs. He was having trouble walking and had vertigo (Tr. 279)

Plaintiff was incarcerated from 1996 until January 1999 (Tr. 439, 441). In December 1996, while he was incarcerated, it was noted that plaintiff's diabetes was "diet controlled." It also was noted that he had a history of Hepatitis C (Tr. 348). He complained of pain in his legs, low back and hands and he said that Ibuprofen did not control his pain (Tr. 350). It was noted in April 1997 that plaintiff walks with a slight limp because of a previous ankle surgery (Tr. 354). Plaintiff was described as morbidly obese and the movement in his lower back was somewhat limited because of spasms. He had limited mobility in his right ankle. He was prescribed Ibuprofen 800 mg., Indocin and Parafon Forte and he was medically unassigned for three days (Tr. 355, 359). In July 1997 he complained of left knee, ankle and foot pain (Tr. 366-367). In October 1997 he complained of right hand and thumb pain (Tr. 371). Checks of his blood sugar were within normal limits for the most part (Tr. 373-374). In May 1998 plaintiff complained of pain in his cervical spine, left hip and leg and said he had vertigo and blurred vision (Tr. 394). In July and September 1998 plaintiff complained of neck, arm, knee and shoulder pain and said it all was becoming worse (Tr. 383, 386).

After his release from prison, X-rays of plaintiff's back in March 1999 showed advanced lumbar disc disease (Tr. 275, 298). He also was described as non-compliant with his diabetes medications and diet (Tr. 269-273). In June 1999 plaintiff's doctor wrote that plaintiff had daily

back pains and suffered from arthritis. His back condition caused his left leg to be weak which could cause him to stumble. His diabetes was not under good control (Tr. 264).

## HEARING TESTIMONY

At the hearing on June 4, 1999, plaintiff, who was represented by counsel, said that he lived in a rented mobile home with five of his children, who ranged in age from 10 to 16 (Tr. 438-439). He had last worked in 1992 as an oil field derrick man. He stopped working because of problems with his back and ankle and because of damaged nerves in his head (Tr. 439).

He went to prison in 1996 following revocation of his probation for the underlying offense of "illegal investment." From 1992 through 1996 his only income was AFDC (Tr. 440). His family helps him with his other bills (Tr. 441). Plaintiff was released from jail on January 29, 1999 (Tr. 441).

The ALJ stated that he talked to prison authorities and they told him plaintiff was incarcerated for transporting drugs. Plaintiff disagreed and said that he was convicted of illegal investment, because he was investing in the marijuana business (Tr. 441-442). His probation was revoked because he did not report to his probation officer for a year and a half (Tr. 442). He had one previous marijuana related arrest about 18 years previously (Tr. 445).

He smoked cigarettes, but had stopped drinking in February 1999. He stopped using street drugs in 1996 (Tr. 443). He is 5'7" and weighed 290 pounds (Tr. 443-444). He was 43 years old and had graduated from high school. In prison his job was folding towels in the laundry, although he would have to take breaks and sit down (Tr. 444). He might still be able to do that kind of work, but there is no laundry in his community (Tr. 445).

He is right handed and speaks, reads and writes English. He also can speak Spanish and read and write some Spanish (Tr. 45-46). He takes care of his own grooming, does some

housekeeping, makes his bed, cooks some and does some of the laundry (Tr. 446). He feeds himself, although he has trouble holding a cup because of arthritis in his hands. He can make a fist (Tr. 447). He lost his driver's license and never obtained another one. He only drives in town. He had last driven the day before but his brother drove him to the hearing. Plaintiff does not own a car (Tr. 447).

He had not had any surgery during the past 10 years but was hospitalized for complications related to his diabetes about six years previously (Tr. 448). He has trouble with his ankle because he had surgery on his foot when he was in the seventh grade and he had pins inserted. He takes insulin for his diabetes (Tr. 449). One of his arms is longer than the other because he broke it at work by sticking it in a fan. He also has damaged nerves in his head from when he was hit in the head by the side of a rig (Tr. 450).

He can button his clothes and tie his shoes. He can sit for an hour and watch television. He goes to the grocery store, but his sons push the cart for him. He has some trouble operating the foot pedals on the car and uses his left leg to operate the brake pedal. He can open and close doors and can move a gallon of milk out of the refrigerator and carry it to the table. There are four stairs leading into his mobile home (Tr. 451-452). He wakes up at 6:30 or 7:00 a.m. He gets up twice during the night to use the restroom or drink water (Tr. 452). During the day he drives his children to school and picks them up. Other than that he stays at home and lies down, watches television, or cooks beans. He does not use any assistive devices to walk and does not use a back support or brace. He can walk about 50-100 feet before his ankles hurt (Tr. 453). When he worked on the oil derrick his ankle always hurt. He can stand for half an hour and sit for an hour. He could not lift a 50-pound object, but he might be able to lift a 40-pound object if it had handles (Tr. 454).

He takes insulin and arthritis medication. Dr. Perry prescribes his medication and he sees him about once a week (Tr. 455-456). Plaintiff was seen by a psychiatrist once after his head injury (Tr. 456-457). In prison they told him he could not lift more than 40 pounds, stand for very long or walk on wet or uneven surfaces (Tr. 457).

His lower back was hurting at the hearing and his ankle hurt when he walked (Tr. 457). He has never asked his doctor if he can work and he has not looked for a job (Tr. 458). His ankle hurts more now than it did when he was working (Tr. 459). His left leg sometimes gives way and he had fallen the day before. He has had trouble with falling for two years. He cannot grip because of the arthritis in both hands. He has hearing problems and cannot work around loud noise. He has had an irregular heartbeat (Tr. 461). He did not have to work while he was in prison because he was considered disabled, but he chose to because he was bored. He was able to sit down when he needed to do so (Tr. 463-464). He spends most of his time with his children, although he sees neighbors occasionally (Tr. 464).

He becomes depressed because he misses his wife, who died nine years earlier (Tr. 461-462). His oldest child was 10 and his youngest was two when his wife died (Tr. 462-463).

The medical expert ("ME") summarized plaintiff's medical records and after looking at the listings for diabetes, arthralgia and back impairments said that he did not meet any of the criteria for listed impairments. Because of plaintiff's previous injury and his ankle pain, the ME would recommend that he not engage in repetitive climbing of scaffolds or ladders (Tr. 465-468). The hypertrophy noted in plaintiff's spine are degenerative changes that happen in middle age. There was no sign of radiculopathy (Tr. 468-469). Also, regarding plaintiff's ankle, the ME stated that in his experience, if hardware inserted to repair a fracture is asymptomatic for many years, it usually remains asymptomatic, although it is possible plaintiff's ankle began to cause him pain as

7

an adult (Tr. 469). The only lasting result of the blow plaintiff received to his head is a mild high frequency hearing loss (Tr. 469). Plaintiff has had a few episodes of tachycardia, which is a rapid heart beat, but it's a normal phenomenon unless there is an ectopic rhythm, and there was no evidence of an ectopic rhythm in the record (Tr. 471). His GAF of 49 indicates serious symptoms on the basis of one evaluation (Tr. 471).

The vocational expert ("VE") testified that plaintiff's work as a derrick man was heavy and semi-skilled with an SVP of three, and his work as a laundry folder was light and unskilled (Tr. 472). The ALJ described a hypothetical person, 43 years old with the same education and work experience as the plaintiff, with no exertional limitations and who was limited to no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs and occasional operation of foot pedals with the left leg. The VE testified that such a person could do plaintiff's previous work as a laundry folder, but not as a derrick worker because of the climbing (Tr. 472). If he did the job as a laundry folder, the base would be reduced somewhat if he had a sit/stand option (Tr. 474).

Plaintiff could also work as a dishwasher, which is a medium and unskilled with 3,620 jobs in Texas and more than 200,000 in the United States. In addition, he could work as an inserter, which is light and unskilled and involves putting one piece of paper into other pieces of paper. There are 1,000 such jobs in Texas and more than 40,000 in the United States. He also could work as an optical goods worker which is unskilled, with more than 2,300 jobs in Texas and more than 96,800 in the national economy (Tr. 472-473). The jobs of laundry folder and dishwasher would require the plaintiff to work in a hot environment (Tr. 474). An inserter has to have some manual dexterity (Tr. 475). The job of optical goods worker would is a bench worker position and requires a certain amount of manual dexterity (Tr. 475). Plaintiff could also work as

a cleaner, which is light and unskilled with 1,400 jobs in Texas and more than 80,000 in the national economy (Tr. 478).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The burden has been described as more than a scintilla, but lower than a preponderance. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995). A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir. 1988)(citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

9

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. Martinez v. Chater, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

## DISCUSSION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 18, 1994 although he did work as a laundry folder while in prison (Tr. 16). The ALJ further found that plaintiff had severe impairments, namely a history of Hepatitis C, a history of drug abuse, diabetes, pancreatitis, an injury to his right ankle as a child, decreased range of motion in his left thumb, a back abscess and hemorrhoids, but that the impairments did not meet or equal the criteria of any listed impairments (Tr. 18). The ALJ next determined that plaintiff had no exertional limitations but could not climb ladders, ropes or scaffolds, and only occasionally could operate foot pedals with his left leg. The ALJ found that plaintiff could not perform his past relevant work as a derrick man in the oil field, but could perform other work in the economy, such as that of a dishwasher and an optical goods worker, and that he could do his past work activity as a laundry folder if he had a sit/stand option (Tr. 26). Accordingly, the ALJ found that plaintiff is not disabled. (Tr. 26).

Plaintiff objects to these findings and argues that the ALJ's decision is not supported by substantial evidence. Specifically, plaintiff argues (1) the ALJ relied on evidence outside the record to find plaintiff not disabled; (2) the ALJ did not properly consider plaintiff's mental

10

impairments; (3) the ALJ failed to consider plaintiff's physical and mental impairments in combination with one another; (4) the ALJ failed to properly consider the plaintiff's exertional limitations; (5) the ALJ failed to consider plaintiff's non-exertional limitations such as depression, vision problems, hearing loss, obesity, dizziness, headaches and poor concentration and (6) the hypothetical question posed by the ALJ was inconsistent with the facts of the case.

**A.  Evidence Outside the Record**

During the hearing the ALJ said that he had "taken the liberty" of contacting people at the "prison locator thing" who told him that plaintiff was in jail for transporting drugs (Tr. 441). Plaintiff said his conviction was not for transporting drugs but for "illegal investment" in a marijuana business.  In any case, plaintiff argues that the ALJ based his opinion on evidence outside the record and was biased against the plaintiff because of his criminal history, his former use of drugs and alcohol and his obesity.

In his written decision, the ALJ did not comment on the reasons for plaintiff's incarceration and did not include any finding about the incarceration in the rationale for the decision.  Rather, he conducted the five-part sequential evaluation called for in the regulations to find plaintiff not disabled.  Accordingly, plaintiff's assertion that the ALJ used information outside the record to decide his case and his allegation that the ALJ was biased against plaintiff because of his criminal history is not supported by the evidence and does not provide a basis for remand of his case.

**B.  Mental Impairments**

Plaintiff argues that the ALJ did not properly consider his mental impairments and specifically that he did not consider that plaintiff may meet the listing for a personality disorder or a substance abuse disorder.  The ALJ found that plaintiff's history of alcohol and substance abuse

was a severe impairment, but that it did not meet a listing.  He reviewed the psychiatric records from 1989, well before plaintiff's purported onset date, when he was hospitalized and underwent a psychiatric evaluation following a fight (Tr. 19, 143-145).  He also reviewed the report from the psychological examination performed in June 1995 (Tr. 19-20, 252-255).  There, the psychiatrist concluded only that plaintiff had mild to moderate dysthymia and episodic alcohol abuse (Tr. 254).

In order to meet a listing for an affective disorder or for a substance addiction disorder, plaintiff would have to show that he had two of the following functional limitations: a marked restriction in his activities of daily living; marked difficulties in maintaining social functioning; frequently had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner or had more than three episodes of deterioration or decompensation in work or work-like settings which caused him to withdraw from the situation or to experience exacerbation of signs or symptoms (Tr. 28-30).  Plaintiff has pointed to no evidence in the record to support his assertion that his mental impairments have ever affected him to the degree of severity contemplated by the listed criteria.  Accordingly, his assertion that the ALJ's findings regarding his mental impairments are not supported by the record are without merit.

**C.  Combination of Impairments**

Plaintiff argues that the ALJ failed to consider his physical and mental impairments in combination with one another.  The regulations state the following:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability process.

20 C.F.R. §§ 404,1524, 416.923. The ALJ must analyze both the disabling effect of each of the claimant's impairments and the combined effect of all the ailments. Fraga v. Bowen, 810 F.2d 1296, 1305 (5th Cir. 1987).

The ALJ stated in his decision that he considered the combined effects of plaintiff's impairments (Tr. 20-22). Plaintiff notes that the ALJ does not dispute that he suffers from depression and related problems but did not consider the effects of the impairments in combination with his physical impairments. As pointed out above, the only evidence in the record regarding plaintiff's mental impairments during the alleged period of disability show that plaintiff had mild to moderate dysthymia and episodic alcohol abuse (Tr. 254). The ALJ took those findings into consideration when he completed the psychiatric review technique form (Tr. 23, 28-31). Plaintiff has pointed to nothing further in the record to show that the effects of plaintiff's mental impairments were more severe than those found by the ALJ. Without such evidence, plaintiff cannot show that his mental impairments rendered him disabled, regardless of whether they were considered singly or in combination with other impairments.

**D. Exertional Limitations**

Plaintiff argues that the ALJ failed to consider his exertional limitations. The ALJ said he considered the entire record before determining plaintiff had no exertional limitations. Evidence in the record which supports his finding includes plaintiff's testimony that he could lift something weighing 40 pounds if it had handles and that when he was in prison he was limited to lifting no more than 40 pounds (Tr. 18).

Plaintiff argues that the finding is inconsistent with plaintiff's immobility and inability to climb. However, the plaintiff never testified that he is immobile. To the contrary, he testified that he can go to the grocery store and walk around, drives his children to school and picks them up,

can remove a gallon of milk from the refrigerator and carry it to the table and can walk up the four steps to his mobile home (Tr. 451-452). Moreover, the ALJ took into consideration plaintiff's limited ability to climb when he said that he could not work at a job that involved the climbing of ladders, ropes or scaffolds and that he could only occasionally climb ramps or stairs (Tr. 24). Plaintiff's argument that the ALJ failed to consider his non-exertional impairments is without merit.

### E. Non-exertional Limitations

Plaintiff argues that the ALJ failed to consider his non-exertional limitations, such as depression, vision problems, hearing loss, obesity, dizziness, headaches and poor concentration. According to the evidence in the record, plaintiff's depression is not disabling, his vision in his right eye was 20/20 and his left eye was 20/40 and he had mild high-frequency hearing loss (Tr. 114-115, 466).

Plaintiff states that he is obese and he thinks he "meets the listing chart" for 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.09. Although the impairments to the endocrine system are listed in § 9, there is no listing or chart at 9.09 so plaintiff's argument is unclear. Prior to August 24, 1999, obesity was listed as an impairment in 20 C.F.R. Subpt. P, App. 1, but it was deleted as an impairment after the Social Security Administration determined that the criteria in the listing were not appropriate indicators of listing-level severity and did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity. SSR 02-1P, 2000 WL 628049 at *1 (S.S.A.). Guidance about the potential of obesity to contribute to impairments is now addressed in the prefaces to the listings for musculoskeletal, respiratory and cardiovascular body systems. Id. Plaintiff presents neither evidence nor argument regarding the

effect of his obesity on his ability to work. He bears the burden of proving he is disabled and he has failed to meet his burden on this issue.

Regarding his dizziness, headaches and poor concentration, the record does not support his allegation that these conditions prevent him from working. Plaintiff did not describe any problems with these conditions at the hearing. Regarding his ability to concentrate, the psychiatrist said only that he would have difficulty with complex tasks for a long period of time (Tr. 254), but the ALJ found that he could work at unskilled jobs. Although he complained of headaches after he was hit in the head while on the job, he did not mention headaches or dizziness at an examination in 1995 (Tr. 245-246) or, with the exception of one mention of vertigo, when he was seen by the medical staff while he was in prison (Tr. 330-427). Without more evidence of either ailment, plaintiff cannot prevail on his claim that the ALJ did not properly consider them.

## F.  Hypothetical Question

Plaintiff complains that the ALJ presented a defective hypothetical question to the VE. In Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994), the Fifth Circuit held:

> Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand.

This standard was refined in Boyd v. Apfel, 239 F.3d 698, 707 (5th Cir. 2001), where the court found that a hypothetical question was defective when it did not incorporate impairments or limitations described in uncontradicted post-hearing examination reports. The court also noted that the holding in Bowling did not state that a party's failure to point out the problems in a

defective hypothetical question salvaged the question as a proper basis for a determination of November 21, 2005non-disability.  Id.

Plaintiff complains that the hypothetical question to the VE was inaccurate or incomplete and argues that the ALJ should have included claimant's complaints of headaches, significant memory or concentration problems, fatigue, wrist pain and dizziness.  However, as discussed above, at the time of the hearing plaintiff was not complaining of headaches or dizziness and had not been diagnosed with significant memory or concentration problems or wrist pain.  There was no basis in the record for the ALJ to include these ailments in his hypothetical question and his failure to do so is not grounds for remand of plaintiff's case.

## RECOMMENDATION

The Commissioner's determination that plaintiff is not disabled is supported by substantial evidence.  It is respectfully recommended that plaintiff's motion for summary judgment (D.E. 24) be DENIED.  The Commissioner's determination that plaintiff is not disabled should be AFFIRMED.

Respectfully submitted this 21st day of November, 2005.

                                                B. JANICE ELLINGTON
                                                UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **TEN (10) DAYS** of receipt of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)-(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).